The PEOPLE of the State of
Colorado, Petitioner,

v.

Paul Alan BRIGGS, Respondent.

No. 83SC134.

Supreme Court of Colorado,
En Banc.

Nov. 18, 1985.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for petitioner.

Gerash & Robinson, P.C., Scott H. Robinson, Denver, for respondent.

NEIGHBORS, Justice.

We granted certiorari to review the court of appeals' decision in *People v. Briggs*, 668 P.2d 961 (Colo.App.1983). The court reversed the defendant's conviction and ordered a new trial, holding that certain testimonial and real evidence must be suppressed because it was derived from involuntary statements that were obtained from the defendant. The court ruled that a witness' testimony compelled by the grant of immunity from prosecution is not a sufficient act of free will on the part of the witness to dissipate the taint of illegality for purposes of the attenuation doctrine.

The court also concluded that the inevitable discovery issue had not been properly preserved by the People for appellate review. We reject the per se rule adopted by the court of appeals and formulate appropriate standards to be used by the trial court in determining whether the disputed evidence has been purged of the taint of illegality by significant intervening events. We agree with the court of appeals that the inevitable discovery question was not presented to the trial court. Accordingly, we affirm the judgment of the court of appeals in part and reverse in part, and we remand to the court of appeals with directions to return the case to the district court for further findings.

I.

The defendant, Paul Briggs, was charged with first-degree murder [1] by an information filed in the Douglas County District Court. Briggs was sentenced to life imprisonment after the jury found him guilty of the crime. His motion for a new trial was denied and he appealed to the court of appeals.

The following are the facts pertinent to the issues upon which we granted certiorari review. The victim, Harry Dewey, died from a gunshot wound to the head on or about November 22, 1979. Investigating officers determined that the murder weapon was likely to have been a rifle reported stolen during the burglary of a mountain cabin in which Dewey was suspected of having participated.[2] The investigation into Dewey's death thus focused on his friends and associates, with a view toward discovering a possible connection between the burglary and Dewey's murder.

Briggs and Dewey had briefly lived together shortly before the homicide. During the investigation Briggs was questioned by detectives several times. On December 19 and 20, 1979, he was interviewed

1. § 18–3–102(1)(a), 8 C.R.S. (1978).

2. At an early stage in the investigation of the homicide, police officers were aware that Dewey had been in possession of property stolen in the burglary.

in connection with the general investigation of Dewey's friends and associates. On the afternoon of December 20, Briggs was taken to the police station, advised of his *Miranda* [3] rights, and questioned. The advisement form given to Briggs states "that you are being questioned in connection with the crime of burglary, theft by receiving, murder and you may be a possible suspect of this crime." On January 4, 1980, Briggs was again taken to the police station. The trial court found that he was given no *Miranda* warnings, and that, in return for information about the burglary, Briggs was promised immunity from prosecution for that crime "as well as the promise of whatever he [the defendant] said, would not be used against him." Briggs admitted that he and Dewey had committed the burglary and that a friend, Kirk Martin, had taken some of the stolen property to Indiana. [4]

Pursuing this lead, the police officers immediately confronted Martin with Briggs' statements and questioned him in an effort to gather further facts about the murder and/or the burglary. Martin informed the officers that he had sold a number of the stolen items to a friend in Indiana, Bill Neeley. On January 7, a detective went to Indiana and questioned Neeley, who related certain statements made to him by Martin to the effect that Martin and Briggs had planned to kill an individual in order to silence what Briggs viewed as that person's indiscreet bragging about his participation with Briggs in a burglary.

When confronted by the officers with this information on January 9, Martin requested and was granted "immunity" [5] and disclosed that Briggs had discussed with him the contemplated murder of Dewey. Martin related that, on the evening of the murder, he had driven Dewey's roommate

around Denver in order to prevent the roommate from interfering with Briggs' plan to kill Dewey. When Martin and Briggs met afterward, the latter described to Martin the details of Dewey's murder.

Martin subsequently took two lie detector tests, acceptable performance on which was a condition to the grant of "immunity" approved by the district attorney and offered to Martin by the investigating officers. Because Martin's statements could not be corroborated and both tests were interpreted by experts as indicating deceptive responses by Martin, he allowed himself to be outfitted with electronic sound recording equipment and agreed to engage Briggs in a conversation designed to elicit and surreptitiously record inculpatory statements. Martin successfully initiated such a conversation on January 14, and comments by Briggs were recorded in which he incriminated himself as the sole perpetrator of Dewey's murder.

On the date of the defendant's preliminary hearing, in accordance with the agreement reached between the authorities and Martin, a formal immunity order was entered by the trial court pursuant to section 13-90-118, 6 C.R.S. (1973). The order stated that Martin "shall not be prosecuted or subjected to any penalty of [sic] forfeiture for or on account of any transaction, matter or thing concerning which he testifies, except a prosecution for perjury in the first degree or contempt committed while giving testimony pursuant to this order."

Briggs requested the trial court to suppress the statements first made by him on January 4 and reaffirmed on January 5, on the ground that those statements were induced by promises of immunity. He also contended that the testimony of Martin and the tape-recorded conversation should be suppressed as "fruits" of his involuntary statements. The trial court suppressed

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** Martin was then living with Briggs in Briggs' home and had been previously briefly questioned by the detectives concerning Martin's possession of a camera stolen in the same bur-

glary. Martin told the officers he had purchased the camera from Dewey.

**5.** The characterization of the agreement between Martin and the law enforcement authorities as "immunity" is discussed in section II.D. of this opinion at page 920.

Briggs' statements, finding that the promises of immunity made by detectives to elicit those statements rendered them involuntary. The court declined, however, to suppress the tape-recorded conversation and the testimony of Martin, ruling that Martin's "intervening independent act" sufficiently attenuated the causal connection between that evidence and Briggs' involuntary statements.

The suppression of Briggs' statements was not appealed by the People. However, the Colorado Court of Appeals reversed the trial court's refusal to suppress Martin's testimony and the tape recording. The court held that evidence was directly and immediately derived from the defendant's illegally-obtained statements. In ordering Martin's statements to the police officers, his testimony, and the tape recording suppressed, the court of appeals further held that the grant of immunity to Martin precluded a finding that the exercise of his free will attenuated the taint of the initial illegality.

## II.

The People contend that the court of appeals erred in holding that the suppressed evidence was not sufficiently attenuated from Briggs' statements to allow its admission. We conclude that the trial court must first resolve the attenuation issue by the application of appropriate standards to the evidence.

## A.

■ Both the fifth amendment to the United States Constitution and article II, section 18 of the Colorado Constitution contain provisions establishing a constitutional privilege against self-incrimination.[6] Each constitution guarantees that a person shall not be compelled to provide any evidence to the government which it might use to obtain his or her conviction of a crime. Each of the respective provisions contains an implied self-executing exclusionary rule: Evidence obtained in violation of the constitutional provision may not be used in criminal proceedings. "The Fifth Amendment, ... is by its terms an exclusionary rule...." *United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir.1976).

It is a longstanding principle in this state that article II, section 18 of the Colorado Constitution "was not intended to merely protect a party from being compelled to make confessions of guilt, but protects him from being compelled to furnish a single link in a chain of evidence by which his conviction of a criminal offense might be secured." *Tuttle v. People*, 33 Colo. 243, 255, 79 P. 1035, 1039 (1905). *Accord Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *see also Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

■ In order to implement the privilege against self-incrimination, both this court and the Supreme Court have looked to fourth amendment analysis and its exclusionary rule for guidance in developing a principled basis to remedy violations of the self-incrimination privilege. It has long been established under the federal constitution that "knowledge gained by the Government's own wrong cannot be used by it...." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Thus, the exclusionary rule mandates the suppression not only of evidence obtained by means abridging constitutional rights, but also the "fruits" of that evidence. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Lowe*, 200 Colo. 470, 616 P.2d 118 (1980).

■ Although "[t]he cases which mark the origin and development of the tainted fruit of the poisonous tree doctrine involved violations of the Fourth Amendment guarantee against unreasonable searches and seizures," *United States v. Massey*, 437 F.Supp. 843, 855 (M.D.Fla.1977), the

---

6. The fifth amendment provides that "[n]o person ... shall be compelled, in any criminal case, to be a witness against himself...." Article II, section 18 states similarly that "[n]o person shall be compelled to testify against himself in a criminal case...."

doctrine also applies to the fruits of a statement obtained in violation of an accused's fifth amendment rights. *United States ex rel. Hudson v. Cannon*, 529 F.2d 890 (7th Cir.1976). Similarly, we have held that "[t]he 'fruit of the poisonous tree' doctrine applies to *Miranda* violations." *People v. Saiz*, 620 P.2d 15, 20 (Colo.1980).[7] The Supreme Court has relied, to a considerable extent, on fourth amendment cases in determining what evidence is excludable as the fruit of a coerced confession. *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). *Kurzer*, 534 F.2d at 516 n. 8.

■ It is established that third-party, live-witness testimony is a fruit under the poisonous tree doctrine, under both the fourth and fifth amendments. *See United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Schaefer*, 691 F.2d 639 (3d Cir.1982); *United States v. Hooton*, 662 F.2d 628 (9th Cir.1981); *Hudson*, 529 F.2d at 892. We hold that such evidence is likewise a fruit for purposes of article II, section 18 of the Colorado Constitution. To conclude otherwise and permit the use of such tainted evidence would be inconsistent with the principle that the reliability of a particular coerced confession cannot serve to justify its admissibility. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). It necessarily follows that the "fruits" analysis must be utilized in any case in which the

fifth amendment privilege against self-incrimination is implicated. *See Harrison*, 392 U.S. 219, 88 S.Ct. 2008 (fruits of a coerced confession must be suppressed); *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964) ("[A] state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him."). Accordingly, we must apply the "fruits" doctrine to this case, where the poisonous tree is involuntary statements obtained from the defendant.

■ The People have not appealed the trial court's ruling that the statements of Briggs to the investigating detectives on January 4 and 5 were involuntary. Therefore, we are bound by that factual determination. We are thus presented only with the question of whether Martin's extra-judicial statements, testimony, and tape-recorded conversation with Briggs are inadmissible "fruits" of Briggs' involuntary statements.[8]

### B.

■ Martin revealed pertinent information about the burglary on January 4 or 5, after being directly confronted with Briggs' statements that Martin had disposed of stolen property. That information led the officers to Indiana and Neeley. Armed with Neeley's statements, the detec-

---

7. The Supreme Court has recently decided that the fifth amendment does not require the suppression of a statement, made after a valid waiver of rights, merely because an earlier unwarned, but voluntary, statement had been obtained in violation of the suspect's *Miranda* rights. *Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Because the statements made to police officers by Briggs were found to be involuntary, it is unnecessary for us to assess the possible impact of *Elstad* on *People v. Saiz*, 620 P.2d 15, 20 n. 7 (Colo.1980). In addition, the disputed evidence here does not include later statements from Briggs to the officers.

8. We reject the People's assertion that *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41

L.Ed.2d 182 (1974), is "directly on point" and, thus, dispositive of this case. The Court emphasized in *Tucker* that the defendant's statement leading to the allegedly tainted witness, while taken in violation of the *Miranda* requirements, was not involuntary in the constitutional sense: "[T]he police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege." *Tucker*, 417 U.S. at 446, 94 S.Ct. at 2364. In contrast, the defendant's statements in this case did not meet the constitutional standard of voluntariness.

tives again confronted Martin who implicated Briggs in the homicide. Therefore, it is plain that the evidence sought to be suppressed was derived from the involuntary statements of Briggs. However, "[n]ot all evidence is rendered inadmissible simply because it would not have come to light but for the unconstitutional actions of the police." *Saiz*, 620 P.2d at 20. The Supreme Court has stated that, even given such a "but for" relationship, "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' J. Maguire, *Evidence of Guilt*, 221 (1959)." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417. Where, as here, the attenuation doctrine is invoked to support the admissibility of evidence derived from a "poisonous tree," it must be ascertained whether the relationship between the defendant's involuntary statements and the challenged evidence is "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). Thus, notwithstanding the direct connection between Briggs' involuntary statements and the challenged evidence, the pertinent inquiry is whether the events separating those statements from the evidence "here sought to be introduced have so dissipated the causal link between them as to render the offered evidence significantly free from contamination." *Saiz*, 620 P.2d at 20.

■ Where the challenged evidence involves the testimony of a live witness, the most usual intervening event is the exercise of free will by that witness. In such cases, the Supreme Court has noted that the inquiry into attenuation is "appropriately concerned with the differences between live-witness testimony and inanimate evidence...." *Ceccolini*, 435 U.S. at 278–79, 98 S.Ct. at 1061. This difference centers around the power of volition possessed by a live witness:

> [E]valuated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

*Ceccolini*, 435 U.S. at 276–77, 98 S.Ct. at 1060. It is, of course, true that "[w]itnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet," and that "[w]itnesses can, and often do, come forward and offer evidence entirely of their own volition." *Id.* at 276, 98 S.Ct. at 1060. These considerations lead us to agree with those courts eschewing the formulation of bright line rules in this context: "The unpredictability of the human will, which is necessarily involved in the use of a witness to prove essential elements of a crime forecloses the adoption of any rigid rules." *United States v. Marder*, 474 F.2d 1192, 1196 (5th Cir.1973).

■ A variety of considerations have been found pertinent to the inquiry into the possibility of attenuation between the constitutional violation and the evidence sought to be introduced at trial.[9] In this

9. It is instructive to examine a few of the many opinions that have applied this attenuation analysis in the context of a live witness, including cases in which the allegedly tainted witness was discovered through a violation of the defendant's fourth amendment rights and those in which the initial illegality violated the defendant's fifth amendment rights.

In a number of cases courts have found insufficient attenuation to break the connection between the challenged testimony and the initial misconduct. In *United States v. Scios*, 590 F.2d 956 (D.C.Cir.1978), an illegal search revealed the identity of a witness who, although initially invoking his privilege against self-incrimination, subsequently testified under a grant of immunity. In holding that the witness' testimony was not sufficiently attenuated from the illegal search to dissipate the taint of the illegality, the court noted that the decision to testify was "not

case, we conclude that the trial court should consider, at least, the following factors in determining whether the evidence sought to be introduced through Martin is attenuated from Briggs' involuntary statements: (1) the role played by Briggs' involuntary statements in inducing Martin's cooperation; (2) the length of time between the involuntary statements and discovery of the challenged evidence; (3) whether Martin was a suspect; (4) the degree of free will exercised by Martin; and (5) the time, place, and manner of all of the questioning of Martin. *United States v.*

a matter of choice, or free will, but made solely to avoid being jailed for contempt." *Scios,* 590 F.2d at 961. Such a decision, in that court's view, was "purely and simply a product of coercion," *id.,* and, thus, no voluntary act of free will could be said to have attenuated the taint of the illegal conduct. Similarly, in *United States v. Rubalcava-Montoya,* 597 F.2d 140 (9th Cir. 1978), the court suppressed the testimony of several illegal aliens discovered as the result of an illegal search of a car in which they were concealed. In assessing whether sufficient attenuation had occurred, the court emphasized that "a key element is whether the testimony is the product of the witness' independent act of will, neither coerced nor induced by the consequences of the illegal search." *Rubalcava-Montoya,* 597 F.2d at 143. The absence of any indication in the record that the witnesses testified voluntarily led the court to infer that the discovery of the witnesses' illegal alien status was used as leverage to coerce their testimony. Thus, the close relationship between the illegality and the challenged testimony precluded a finding of attenuation in these cases. *See also Williams v. United States,* 382 F.2d 48 (5th Cir. 1967); *United States ex rel. Hudson v. Cannon,* 529 F.2d 890 (7th Cir.1976); *United States v. Alston,* 311 F.Supp. 296 (D.D.C.1970) (no attenuation where robbery victim discovered when illegal search of defendant's wallet disclosed stolen check); *Smith v. United States,* 344 F.2d 545 (D.D.C.1965) (no attenuation found where possessor of stolen property would not have come forward absent a police investigation based on misconduct).

Other courts have applied this ad hoc analysis to reach the conclusion that challenged testimony was sufficiently attenuated from the primary illegality to dissipate the taint and allow admission of the evidence. In *United States v. Stevens,* 612 F.2d 1226 (10th Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980), the court found adequate attenuation from an illegal wiretap when the witness, arrested with the defendant, implicated the defendant more than a month after the witness' arrest and

*Schaefer,* 691 F.2d 639 (3d Cir.1982); *United States v. Hooton,* 662 F.2d 628 (9th Cir.1981). *See also Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054.

■■■ In formulating these relevant considerations, we reject that aspect of the balancing process in the attenuation analysis that weighs the flagrancy and purpose of the official misconduct against the deterrent effect of an exclusionary rule.[10] Balancing these factors is not an appropriate consideration where introduction of the evidence would violate the defendant's right

after entering into a plea bargain. The court in *Stevens* distinguished *United States v. Scios,* 590 F.2d 956 (D.C.Cir.1978), discussed above, on the basis that *Scios* involved testimony under threat of contempt after immunity had been granted, while *Stevens* "offered to testify; his statement declared this decision was in part motivated by a desire 'to change his lifestyle and stay out of trouble.' " *Stevens,* 612 F.2d at 1230. *See also United States v. Leonardi,* 623 F.2d 746 (2d Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980) (decision to cooperate with authorities made out of self-interest and, thus, voluntary); *United States v. Mergist,* 738 F.2d 645 (5th Cir.1984) (attenuation found where witness testified as to the voluntariness of his testimony); *United States v. Evans,* 454 F.2d 813 (8th Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2423, 32 L.Ed.2d 668 (1972) (attenuation found where witness elected to plead guilty and volunteered to testify against other defendants); *Smith v. United States,* 324 F.2d 879 (D.C.Cir. 1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 *reh'g denied,* 379 U.S. 873, 85 S.Ct. 21, 13 L.Ed.2d 80 (1964) (attenuation found where, after "reflection," an uncooperative witness elected to testify).

**10.** In the context of fourth amendment analysis, some courts have formulated the pertinent criteria to include: "(1) '[T]emporal proximity'; i.e., the amount of time between the illegality and the obtainment of the disputed evidence; (2) '[I]ntervening circumstances'; (3) '[A]nd, particularly, the purpose and flagrancy of the official misconduct.' " *Crews v. United States,* 389 A.2d 277, 296 (D.C.Cir.1978), *rev'd,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (reversed on grounds that allegedly tainted evidence had independent source). *See also United States v. Hooton,* 662 F.2d 628 (9th Cir.1981) (factors in attenuation analysis include willingness of witness to testify; the role played by the illegally seized evidence in inducing his cooperation; temporal proximity between illegality, decision to testify, and actual testimony; and police motivation in conducting illegal search).

to be free from self-incrimination. It is clear that the exclusionary rule in fifth amendment cases deters police misconduct, as it does in fourth amendment cases, and ensures the trustworthiness of evidence. *See Michigan v. Tucker,* 417 U.S. 433, 446–50, 94 S.Ct. 2357, 2364–67, 41 L.Ed.2d 182 (1974). However, application of the rule for fifth amendment violations has only an incidental effect on deterrence because that rationale is not the primary purpose for the rule in situations in which the fifth amendment is implicated. Thus, in many contexts, exclusion of evidence collected in violation of a defendant's fifth amendment rights is required to implement those rights. It has been noted that, while one principal purpose of the judicially created fourth amendment exclusionary rule is to deter official misconduct, "[t]he Fifth Amendment, in contrast, is by its terms an exclusionary rule...." *United States v. Kurzer,* 534 F.2d 511, 516 (2d Cir.1976). *Accord United States v. Tantalo,* 680 F.2d 903, 908 (2d Cir.1982); *United States v. Cella,* 568 F.2d 1266, 1285 (9th Cir.1977); *In re Grand Jury Proceedings,* 497 F.Supp. 979, 983 (E.D.Pa.1980). *See also United States v. Henderson,* 406 F.Supp. 417, 421 n. 4 (D.Del.1975) (the judicially created fourth amendment exclusionary rule and the constitutionally mandated exclusion of evidence obtained in violation of fifth amendment rights rest upon different grounds, and are not subject to the same analysis).

Legal commentators have recognized this distinction between the fourth and fifth amendment exclusionary rules. One author has observed that, because "the primary purpose of the Fifth Amendment privilege is to avoid forcing an individual to contribute to the imposition of criminal penalties upon himself, not to protect his privacy," Comment, *Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli,* 82 Yale L.J. 171, 177 (1972), it is inadequate merely to apply the deterrence rationale of the fourth amendment exclusionary cases to the fifth amendment:

> Thus, unlike the Fourth Amendment, the Fifth Amendment is directly concerned with the introduction of tainted evidence at trial; it is in fact the introduction of such evidence that constitutes the primary violation of the Amendment. Even if the exclusion of evidence derived from a coerced confession is unlikely to have a deterrent effect on the police, its introduction will still represent an infringement on the individual's privilege against self-incrimination.

*Id.* at 178 (footnote omitted). Another writer states that "[t]he privilege against self-incrimination thus simply is the exclusion of such evidence: without this exclusion there is no privilege." Zupancic, *The Privilege Against Self-Incrimination,* 1981 Ariz.St.L.J. 1, 19. "This point cannot be over-emphasized. The substantive sanctions against the police who violate the privilege ... simply are not adequate. This is not a question of deterring police from future misconduct." *Id.* at 19 n. 5.

### C.

We now consider, in light of the legal principles stated in parts A. and B. of this section, whether immunized testimony is the equivalent of compelled testimony and is insufficient to attenuate the taint of a constitutional violation.

It will often be the case that the degree of compulsion inhering in immunized testimony will be such as to negate the possibility that the witness has sufficiently exercised his free will to attenuate the taint of the initial illegality. It is generally true that:

> Testimony given in response to a grant of legislative immunity is the essence of coerced testimony. In such cases there is no question whether physical or psychological pressures overrode the defendant's will; the witness is told to talk or face the government's coercive sanctions, notably, a conviction for contempt. The information given in response to a grant of immunity may well be more reliable than information beaten from a helpless defendant, but it is no less compelled.

*New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979).

■ We decline, however, to establish a per se rule that the immunized testimony can never be an act of free will on the part of the witness sufficient to attenuate the taint of the initial illegality. We consider the Supreme Court's comments regarding a possibly coerced confession following an illegal arrest to be useful in assessing the present situation as well:

> The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test.

*Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).[11]

### D.

Before turning to the inevitable discovery issues, we address the court of appeals' characterization of the agreement between Martin and the investigating detectives as "immunity" because that matter is critical to the attenuation analysis, particularly the "free will" criterion. The police officers, the witness, and counsel for the parties have consistently applied the "immunity" label to that agreement. However, based on the undisputed testimony, we conclude that the more precise description of the People's agreement with Martin is a promise of immunity or promise not to prosecute.

Upon being confronted with the statements of Neeley, Martin requested "immunity." After the detectives conferred with the district attorney, a bargain was struck. Martin agreed to tell the officers what he knew about the details of the homicide. In return, the officers promised Martin he would not be charged with the murder if he was not involved in a crime of violence and he passed a lie detector test. After failing two polygraph examinations, the detectives and Martin entered into further negotiations. A second agreement was reached whereby Martin would be granted immunity if he was able to obtain incriminating statements from Briggs. When such statements were obtained, a formal order of immunity was entered by the trial court.

■ In light of the principles set forth in this opinion, it is necessary to distinguish between Martin's in-court testimony, given pursuant to a formal judicial grant of immunity in the criminal proceedings, and his statements to the officers and the tape recording. There are principled reasons why we decline to equate a promise of immunity with a grant of immunity.[12]

■ There is a functional distinction between a promise and a grant of immunity in terms of the sanctions which the court may invoke against a witness who refuses to perform his end of the bargain. Violation of a formal immunity grant can result

---

11. While it is true that, unlike non-testimonial objects, "[w]itnesses can, and often do, come forward and offer evidence entirely of their own volition," *United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978), and while the Supreme Court has stressed this characteristic of live witnesses, it is also true that live witnesses can exhibit an intransigence not characteristic of a gun or document. When the latter items of real evidence are discovered they may be forced to yield all incriminating information contained within them, subject only to the limitations of investigative technology and ingenuity. Even once discovered, however, the live witness can, and often does, refuse to cooperate further with investigating authorities. Thus, while we agree with the Supreme Court's observations regarding the distinctions between the live witness and inanimate evidence, we do not lose sight of the potential for the former to exhibit an obstinacy not characteristic of the inanimate object. When a live witness has exhibited such an inclination his testimony can often be compelled through a grant of immunity; however, such testimony cannot usually be said to be the product of the witness' free will.

12. One difference between the two which is not relevant to this case relates to enforceability. Immunity grants are enforceable in accordance with the statutes which authorize them. In contrast, a witness or suspect armed only with a promise of immunity or a promise not to prosecute, must rely on due process, equitable or contract principles for its enforceability. *E.g., People v. Manning,* 672 P.2d 499 (Colo.1983); *People v. Fisher,* 657 P.2d 922 (Colo.1983).

either in a jail term for contempt or prosecution for perjury. Indeed, it is the availability of such sanctions which have led courts to characterize immunized testimony as "compelled" or "coerced." *E.g., United States v. Scios,* 590 F.2d 956 (D.C.Cir.1978). On the other hand, statements made pursuant to a mere promise of immunity are not subject to such sanctions, so that while they may be induced by the promise, they are not "compelled." *See State v. Wakinekona,* 53 Hawaii 574, 499 P.2d 678 (1972); R. Thornburgh, *Reconciling Federal Prosecution and the Fifth Amendment: "Criminal Coddling," "The New Torture" or "A Rational Accommodation?,"* 67 J.Crim.L. & Criminology 155, 166 (1976).

 Moreover, where the promise of immunity is made conditional, *e.g.,* upon satisfactory performance on a polygraph examination, the promisee recognizes the possibility that he may not receive immunity. While the witness may continue to have an incentive to speak to the law enforcement authorities, he has not been induced to do so to the same extent as in the unconditional promise or formal grant of immunity situations. *Cf. United States v. Houltin,* 566 F.2d 1027 (5th Cir.), *cert. denied,* 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118, *reh'g denied,* 439 U.S. 997, 99 S.Ct. 600, 58 L.Ed.2d 671 (1978).[13]

 It is thus important for trial courts to examine the degree of volition exercised by a witness or suspect by evaluating the context in which his statement was made. *See* Grano, *Voluntariness, Free Will and the Law of Confessions,* 65 Va.L.Rev. 859–60 (1979). Although the Supreme Court has rarely used this approach in express terms, *but see United States v. Jorn,* 400 U.S. 470, 484 n. 11, 91 S.Ct. 547, 557 n. 11, 27 L.Ed.2d 543 (1971), it implicitly adheres to such a practice. *Compare Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), *and Corbitt v. New Jersey,* 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978) (a guilty plea is voluntary even though induced by threat of substantially higher penalty or promise of benefit), *with Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *accord Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (per curiam) (confession involuntary if obtained by any direct or implied promises, however slight).

 In considering whether a witness has acted of his own free will in giving a statement, it is instructive to consider cases involving a coerced confession. Whether free will was exercised in such situations depends on the circumstances of the particular case. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The analogy is useful where immunized testimony is at issue, because "compelled" utterances are present in both instances. In confession cases, however, the speaker's statement will be used against him, whereas in the immunity-attenuation context, it will be used against others. Since an individual will generally be more reluctant to incriminate himself than someone else, a greater degree of free

---

**13.** We consider unpersuasive the reasoning of *United States v. Houltin,* 566 F.2d 1027 (5th Cir.), *cert. denied,* 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 *reh'g denied,* 439 U.S. 997, 99 S.Ct. 600, 58 L.Ed.2d 671 (1978), a fourth amendment case displaying some parallels to the instant case. The court in *Houltin,* although finding the challenged testimony admissible on alternate grounds, indicated that "[o]ne source of attenuation ... is to be found in the exercise of the codefendants' own wills," *id.* at 1032, when they testified under a grant of immunity. In discounting the threat of contempt as a factor nullifying the free will of the witnesses, the court emphasized that the unpalatable nature of the choice between testifying and contempt did not render it less an exercise of free will: "In short, codefendants' choice may have been hard, but it was a choice nonetheless." *Id.*

We view this analysis as tantamount to stating that a witness may always choose to resist the official coercion brought to bear upon him and, as the force of that coercion increases, it is merely the difficulty of the witness' choice to continue to resist that increases concomitantly. And while we refuse in this opinion to adopt a per se rule that immunized testimony is always involuntary for purposes of the attenuation analysis, we similarly decline to adopt the converse position, suggested by the reasoning of *Houltin,* that a witness always exercises his free will in choosing to testify rather than risk contempt.

will must be shown in the former instance than in the latter to establish attenuation.

## III.

The People claim that the prosecution raised the inevitable discovery question at the suppression hearing and that the case should be remanded to the trial court for factual findings on the issue. We reject both arguments.

### A.

In *People v. Lee*, 630 P.2d 583, 591 (Colo. 1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982), we recognized the doctrine of inevitable discovery, in addition to a showing of independent source or attenuation, as a basis for the admission of evidence in circumstances where a constitutional violation has occurred. We stated: "As an alternative to a showing of independent source or sufficient attenuation the prosecution might be able to demonstrate, as a basis for admission, that the witnesses and their testimony inevitably would have been discovered in the normal course of police investigation." (Citations omitted.) *See also People v. Quintero*, 657 P.2d 948 (Colo.), *cert. dismissed sub nom. Colorado v. Quintero*, 464 U.S. 1014, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983).

The Supreme Court has recently established, in the sixth amendment right to counsel context, that the exclusionary rule does not compel the suppression of evidence that the prosecution can show would have been inevitably discovered absent the police misconduct or mistake: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) (footnote omitted).[14] Moreover, the reception of such evidence does nothing to compromise "either

the integrity or fairness of a criminal trial." *Id.* 104 S.Ct. at 2510. This analysis applies equally in the context of a fifth amendment violation. *See id.* at 2508 n. 3. Thus, the challenged evidence in this case would have been properly admitted if the People had demonstrated that it would have been inevitably discovered. *See People v. Lee*, 630 P.2d 583 (Colo.1981).

### B.

We now turn to the court of appeals' holding that the inevitable discovery question was not preserved for review. At the suppression hearing, the deputy district attorney made the following statements in his argument to the court:

MR. SELL: I realize that they learned of the—as we've been calling here—the "Indiana Connection" through some statements obtained from Mr. Briggs. Then they, subsequently, learned of who Bill Neeley was through talking to Kirk Martin. And they, subsequently, learned through Bill Neeley various other bits of information once they had interviewed him. I think, when we look at the whole scenario of that, there are a number of exceptions to the *Wong Sun* rule that are present here. And the Court is aware there are several exception, [sic] one being if the evidence is the connection between illegality and the evidence subsequently discovered, if that connection is so attenuated as to dissipate the connection, there is not taint and the rule of law of suppressing that evidence would not apply.

Secondly, there's the exception of independent source. I think that also applies in this case because we have an independent source. We have Bill Neeley. We also have Kirk Martin who is actually an independent source because they already knew his identity. They knew that he had some involvement with the burglary that's been investigated, so they came and talked to him.

---

**14.** The question of whether the burden of proof should be by "a preponderance of the evidence" or "clear and convincing evidence" under the Colorado Constitution is not presented in this case. Hence, we leave that issue for another day.

THE COURT: Are you saying this is an intervening independent act by a third party?

MR. SELL: It's an independent intervening factor or intervening source.

■ The record establishes that the prosecutor did not rely upon "inevitable discovery" during the proceeding, but, instead, urged that the contested evidence should be admitted under either the "attenuation" or "independent source" exceptions to the exclusionary rule. There is a functional similarity between the inevitable discovery and independent source doctrines in that each is designed to prevent the prosecution from being in a worse position simply because of police error or misconduct, if the government can establish that the evidence was discovered through a source independent of the constitutional violation or that the information would have been inevitably discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In his dissenting opinion in *Nix*, Justice Brennan cogent-ly explained the distinction between the two exceptions.

When properly applied, the "independent source" exception allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means.... The "inevitable discovery" exception ... differs in one key respect from its next of kin: specifically, the evidence sought to be introduced at trial has not actually been obtained from an independent source, but rather would have been discovered as a matter of course if independent investigations were allowed to proceed.

*Id.* 104 S.Ct. at 2517 (Brennan, J., dissenting).

■ In applying these principles to the record before us, we conclude that the inevitable discovery issue was not raised in the trial court. We construe the substance of the evidence presented by the prosecutor and his arguments at the suppression hearing as raising only the grounds of attenuation and independent source [15] as exceptions to the exclusionary rule.[16] Thus, the

---

15. The evidence with which we are concerned is Martin's extra-judicial statements implicating Briggs, Martin's trial testimony, and the recorded conversation between him and Briggs. In abandoning the independent source rationale on appeal, the attorney general has correctly recognized that the doctrine is not pertinent here. That principle would require the prosecution to establish that a source other than Martin was the basis of the People's knowledge of Neeley or that a person other than Neeley reported Martin's statements attributable to Briggs and Martin concerning the plan to kill the victim.

16. We likewise reject the People's assertions that "the fact of inevitable discovery is apparent on the record." The record is barren of any facts which would tend to establish that the evidence would have been discovered in the normal course of police investigation. The People's sole argument that Martin would have eventually implicated Briggs because Martin realized he was "in very deep trouble" is speculative when considered in light of Martin's testimony.

He testified in pertinent part, as follows:
Q The January 9 interview with Bob Brown, did you implicate anyone in that interview?
A Yes, I did.
Q Whom did you implicate in that interview?
A Myself and Paul Briggs.

Q What was different about the January 9 interview that made you decide to implicate someone?
A To be granted immunity by the District Attorney.
Q Were there any conditions on that grant of immunity, as you understood it?
A Yes.
Q What were those conditions?
A They were that I would tell them the truth about my involvement and successfully pass a polygraph test. And as long as I did not commit any violent crime, then I would not be charged with anything.

. . . .

Q So you made the deal or the understanding that you would have immunity and you made a statement to the police implicating yourself and Mr. Briggs on January 9, right?
A Right.

. . . .

Q Had you not been granted immunity, would you have gone up there wired, just to satisfy people that you were telling the truth?

. . . .

A No.
Q Had you not been offered a grant of immunity, would you have gone up and participated in that conversation, the wired conversation, with Paul Briggs?
A At this time I do not know.

· inevitable discovery question is not presented by the record before us.[17]

The judgment of the court of appeals is affirmed in part, reversed in part, and remanded with directions to return the case to the district. court for further findings consistent with the views expressed in this opinion.

ROVIRA, J., dissents in part and concurs in part.

ERICKSON, J., joins in the dissent and concurrence.

KIRSHBAUM, J., does not participate.

ROVIRA, Justice, dissenting in part and concurring in part:

I respectfully dissent from Part II of the majority opinion.

Part II of the majority opinion adopts "at least" a five-part test for purposes of determining whether there was sufficient attenuation between Briggs's statements of January 4, 1980, and the challenged evidence obtained through Martin. At 917. The majority then remands the case for findings consistent with the new test. While the test may be of some help to trial courts deciding attenuation issues in the future, I see no need for remanding this case to the trial court. Rather, the substantial record which already exists not only provides overwhelming evidence of Briggs's guilt but also supports a finding of attenuation under the new test.

The first factor of the majority's five-part test requires the trial court to consider "the role played by Briggs's involuntary statements in inducing Martin's cooperation." Majority op. at 917. Admittedly, Briggs's statement of January 4, 1980, played a role in convincing Martin to cooperate. The record shows that on January 4 Briggs admitted to the police that he committed the burglary with Dewey and that Martin had transported some of the stolen property to Indiana. Based on this information, the police immediately confronted Martin, gave him *Miranda* warnings, and proceeded to establish the first link in a rather long chain which ultimately led to Briggs's conviction. This conclusion is easily drawn from the existing record.[1]

While the first factor, as applied to this case, militates against a finding of attenuation, the remaining four factors do not. Moreover, the record, as is, contains evidence relevant to the remaining four factors sufficient to preclude the need for remand.

The second factor of the new test requires the trial court to consider "the length of time between the involuntary statements and discovery of the challenged evidence." However, the record already shows that five days passed between the date Briggs was promised immunity, January 4, 1980, and the date Martin first made statements implicating Briggs in the murder after he requested immunity, January 9, 1980. Similarly, we already know that ten days passed between January 4, 1980,

---

**17.** Whether the People are precluded from arguing that some or all of the suppressed evidence is admissible against the defendant under the inevitable discovery doctrine upon remand is an issue which was neither briefed nor raised by the parties. Thus, the question, if it is raised, must first be presented to the trial court. *See People v. White,* 392 Mich. 404, 221 N.W.2d 357, 367 n. 9 (1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 835, 42 L.Ed.2d 843 (1975); *State v. McLemore,* 561 P.2d 1367 (Okla.Crim.App.1977); *Commonwealth v. Hart,* 479 Pa. 84, 387 A.2d 845 (1978). We note that our decisions in *People v. Quintero,* 657 P.2d 948 (Colo.), *cert. dismissed sub nom. Colorado v. Quintero,* 464 U.S. 1014, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983); *People v. Madson,* 638 P.2d 18 (Colo.1981); and *People v. Lee,* 630 P.2d 583 (Colo.1981), *cert. denied,* 454

U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982), as well as the Supreme Court's opinion in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), *cert. denied,* — U.S. —, 105 S.Ct. 2681, 86 L.Ed.2d 699 (1985), were announced after the trial was held in this case.

**1.** While the statement by Briggs on January 4 stimulated the police to focus on Martin, there is no reason to believe that the investigation would have ceased absent the statement. Hence, although the role played by Briggs's statement was substantial, it is by no means fatal to further attenuation analysis. *See United States v. Schaefer,* 691 F.2d 639, 645 (3d Cir. 1982).

and the date Martin recorded Briggs's statements, January 14, 1980, which incriminated Briggs as the sole perpetrator of the murder. Over one month passed between January 4, 1980, and the formal order of immunity; and over nine months passed between January 4, 1980, and Martin's testimony at trial. In my opinion, while the five-day period between January 4, 1980, and January 9, 1980, may be too short, the other periods are not so close to the date of the initial taint as to bar a finding of attenuation. In short, there is nothing further to learn in regard to the relevant time frames—there is nothing further to be gained by remanding the issue to the trial court.

The third factor requires the trial court to consider "whether Martin was a suspect." Here again, I think the record clearly shows that Martin was a suspect at the time of the initial illegality. The record establishes that as early as December 20, 1979, detectives had questioned Martin about the burglary and the murder. On that date, the police discovered that Martin was living with Briggs, was occupying the murder victim's old room, and was in possession of a camera believed to have been stolen in the Barnewell burglary. In fact, on December 20, 1979, after consenting to a search of his room, Martin told the police that he had purchased the camera from Dewey. In sum, the record now shows that Martin was indeed a suspect; accordingly, there is no need for remand on this point.

The fourth factor requires the trial court to consider the "degree of free will exercised by Martin." In considering the free will of Martin, the majority also urges the trial court to consider whether Martin was acting under a "promise" of immunity as opposed to a "grant" of immunity. In analyzing the free will factor, I believe that the record contains sufficient evidence that the statements, recording, and testimony obtained through Martin were all accompanied by indicia of free will. Specifically, it is important to note that Martin *requested* immunity on January 9; the police did not offer immunity. It is also important to

consider that Martin had displayed some tendency toward cooperation as early as December 20, 1979, when he consented to a search of his bedroom and later admitted to the investigating officers that he had purchased the stolen camera from Dewey. With regard to Martin's free will relative to surreptitiously recording Briggs on January 14, the trial court has already found that Martin was motivated, in part, by a desire "to obtain sufficient information to clear his name," "to exonerate himself from the deceptive results of the polygraph examination," and "to clear his own name and rehabilitate his position as to his claim of veracity." These findings by the trial court, supported by the record, clearly evidence an intention on the part of Martin to cooperate with the police. The fact that Martin was formally granted immunity on the date of the preliminary hearing does not extinguish or limit this preexisting inclination toward cooperation.

Given, however, that the trial court must now once again consider the free will issue, I think it important to emphasize a few of the factors which have been recognized as significant in determining the existence of free will in attenuation analysis. In *United States v. Stevens*, 612 F.2d 1226 (10th Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980), a case in which an accomplice agreed to testify against the defendant as part of a plea bargain, the Tenth Circuit found "sufficient voluntariness" and, in so doing, noted that the witness's decision to testify was motivated in part "by a desire to change his life style and stay out of trouble." *Id.* at 1230. In *United States v. Mergist*, 738 F.2d 645 (5th Cir.1984), the Fifth Circuit found attenuation and noted it was relevant that the witness said "that he was testifying voluntarily and of his own free will, and had not been coerced or threatened to do so." *Id.* at 648. *See also United States v. Hooton*, 662 F.2d 628, 632 (9th Cir.1981), *cert. denied*, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982). In *United States v. Leonardi*, 623 F.2d 746 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct.

3027, 65 L.Ed.2d 1123 (1980), the Second Circuit affirmed the trial court's refusal to strike a witness's testimony which had been claimed by the defendant to be the product of an illegal seizure. The court held that the trial testimony was sufficiently attenuated from the illegal search. In deciding the free will issue, the court considered: "the stated willingness of the witness to testify, the role played by the illegally seized evidence in gaining his cooperation, the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial, and the police motivation in conducting the search." *Id.* at 752, citing *Ceccolini*, 435 U.S. 268, 98 S.Ct. 1055. After reviewing the record and noting it was likely that the witness "decided to cooperate as a matter of self interest," the court concluded that the testimony was the "product of detached reflection and a desire to be cooperative." *Id.* at 753, quoting *Ceccolini*, 435 U.S. at 277, 98 S.Ct. at 1060. *See also United States v. Schaefer*, 691 F.2d 639, 645 (3d Cir.1982) (witness's decision to testify "stemmed from his voluntary decision to promote his own interests with respect to sentencing"). While these factors are not exhaustive, their presence or absence should help guide trial judges and counsel in resolving the free will issue.

In analyzing the free will issue, the majority places particular emphasis on the distinction between a promise of immunity and a formal judicial grant of immunity. The majority finds this distinction important because a witness testifying under an official grant of immunity may face a jail term for contempt or prosecution for perjury if he refuses to testify. Conversely, the witness who provides evidence while under a promise of immunity is not subject to such sanctions. Majority op. at 920. The majority suggests that this distinction affects the free will determination because testimony provided pursuant to a formal grant of immunity is akin to "compelled" or "coerced" testimony. While I doubt that this distinction has merit, it must be emphasized that the majority has not adopted a per se rule; that is, the mere fact that

evidence is obtained from a witness under a formal grant of immunity does not automatically foreclose a finding of free will. Majority op. at 919–920. It is still possible for the prosecution to establish that the witness acted with free will both before and after receiving the official grant of immunity. Upon such a showing, the trial judge would be warranted in finding sufficient attenuation between the initial illegality and the testimony of the witness.

The fifth factor mandated by the majority requires the trial court to consider "the time, place, and manner of all of the questioning of Martin." This factor is apparently derived from *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), in which the Court stated: "The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness." *Id.* at 277, 98 S.Ct. at 1060. Unfortunately, the *Ceccolini* Court did not explain what may or may not be an appropriate time, place, and manner. However, there is nothing in the record suggesting that the time, place, and manner of questioning was inappropriate. If there was anything inappropriate or unduly coercive about the time, place, and manner of questioning, I think it is safe to assume that a record would have been made on the issue.

Hence, all of the factors listed by the majority as determinative of the attenuation issue are already satisfied to varying degrees by evidence found in the record. In the words of the United States Supreme Court: "the trial resulted in a record of amply sufficient detail and depth from which the determination may be made." *Rawlings v. Kentucky*, 448 U.S. 98, 107, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). In my opinion, the existing evidence is sufficient to support a finding of attenuation and, accordingly, I would affirm the conviction.

Finally, I disagree with the majority's categorical rejection of the balancing analy-

sis involving the exclusionary rule's deterrent effect when determining whether the challenged evidence is sufficiently attenuated from the initial taint. Majority op. at 918. In the fourth amendment context, it is well settled that a judge may properly weigh the flagrancy and purpose of the official misconduct against the deterrent effect of exclusion. *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). The majority reasons that the exclusionary rule in the fifth amendment context has only an incidental effect on deterrence and that the fifth amendment "is by its terms an exclusionary rule." Majority op. at 918, quoting *United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir.1976). However, neither this court nor the United States Supreme Court has ever held that the fifth amendment right against self-incrimination absolutely prohibits a trial judge from considering as a factor, in attenuation analysis, the nature of the original taint. To the contrary, *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), suggests that such an inquiry would be proper. In that case, the defendant was arrested for rape and, without being given full warnings consistent with *Miranda*, stated that he was with a friend at the time of the crime. The friend later provided statements which tended to incriminate the defendant. The Court held that, even though the defendant was not given his full *Miranda* warnings, he was not deprived of his privilege against self-incrimination because his statements were voluntary and were not induced by the threat of potential legal sanctions such as the threat of contempt. *Id.* at 445, 94 S.Ct. at 2364. The Court consequently held that the evidence derived from the defendant's initial statement was admissible. Writing for the majority, Justice Rehnquist reasoned that in the search and seizure context the exclusionary rule's "prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *Id.* at 446, 94 S.Ct. at 2365, quoting *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). He then went on to state:

In a proper case this rationale would seem applicable to the Fifth Amendment context as well.

The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

417 U.S. at 447, 94 S.Ct. at 2365. Unfortunately, Justice Rehnquist never explained what the "proper" fifth amendment case might be. Clearly, *Michigan v. Tucker* established that a majority of the Supreme Court was unwilling to hold that the fifth amendment forbids all inquiry into the nature of police misconduct.

The fifth amendment violation in the present case stems from the promise of immunity which was given the defendant on January 4, 1980. As noted by the majority, the People did not appeal the trial court's ruling that Briggs's statements pursuant to the promise of immunity were involuntary because they were based on "promises [that] were implied regardless of how slight they may be." It is important to note the trial court found that there were "no threats or violence in this case...." Hence, we have an involuntary statement elicited in good faith by the police. Against this should be balanced the social costs associated with excluding probative and reliable evidence of the defendant's guilt. In my opinion, this is the type of "proper" fifth amendment case in which a trial judge should consider, in addition to the other factors promulgated by the majority, the nature of the alleged police misconduct.

Accordingly, I would reverse the judgment of the court of appeals on the issue of attenuation and affirm the judgment of the trial court. I concur in the judgment of the court on the issue of inevitable discovery.

I am authorized to say that Justice ER-ICKSON joins me in this dissent and concurrence.