**UNITED STATES of America, Appellee,**

v.

**Michael SCHAEFER and Clairton Slag, Inc., Appellants.**

No. 81–3099.

United States Court of Appeals, Third Circuit.

Argued June 25, 1982.

Decided Oct. 22, 1982.

J. Alan Johnson, U. S. Atty. by Sandra D. Jordan (argued), Asst. U. S. Atty., U. S. Dept. of Justice, Pittsburgh, Pa., for appellee.

Livingston, Miller, O'Malley & Clark by Thomas A. Livingston (argued), Dennis J. Clark, Pittsburgh, Pa., for appellants.

Before GARTH and BECKER, Circuit Judges, and FULLAM, District Judge.*

* Honorable John P. Fullam, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

FULLAM, District Judge.

The defendants, Clairton Slag, Inc., and its president, Michael Schaefer, were convicted in the Western District of Pennsylvania of making false statements to a federal agency by misrepresenting the quantities of paving materials delivered to a federally funded highway project, in violation of 18 U.S.C. § 1020, and Schaefer was convicted of conspiring to do so, 18 U.S.C. § 371. Their initial appeal to this Court resulted in a remand for an evidentiary hearing on their motion to suppress certain evidence introduced by the Government at trial. *U. S. v. Schaefer, et al.,* 637 F.2d 200 (3d Cir. 1980).

Following the remand, the district court held an evidentiary hearing and, on November 9, 1981, reaffirmed its previous order denying defendants' motion for a new trial. The district court concluded that the evidence in question was obtained with the consent of the defendants and that, in any event, its admission was harmless beyond any reasonable doubt. This appeal followed. We reverse and remand for a new trial.

### I.

The defendants operated a batch plant supplying bituminous material to the Pennsylvania Department of Transportation ("PennDOT") for road construction purposes, pursuant to various contracts. One such contract related to a federally funded project in Washington County, Pennsylvania, which was being constructed during the summer and fall of 1977. The defendant Clairton Slag, Inc., which is wholly owned by the defendant Schaefer, was being paid a specified price per ton of material delivered to the construction site. The district attorney of Washington County received an anonymous tip that the job was being short-weighted. He thereupon instructed a county detective and the State Police to conduct an investigation.

Defendants' trucks (owned by Schaefer and leased to Clairton) were loaded from an overhead bin. The amount of bituminous material in the bin for discharge to the vehicles was controlled by levers and related devices operated by one of defendants' employees. Each operation was supposed to discharge a "batch" containing 4,000 pounds of material. Twelve such "batches," or 48,000 pounds, constituted a normal load for each vehicle. As each truck was loaded, the operator filled out a yellow weight-slip and gave it to the driver. A PennDOT inspector was stationed at the loading site to ensure maintenance of proper quality standards, and also to verify the weights. He was required to fill out a white weight slip, which was also given to the driver of the truck. Upon arrival at the construction site, the driver presented both copies to a PennDOT inspector; these documents constituted the basis upon which payments to Clairton under the contract were calculated.

The evidence at trial established that, while the white and yellow weight slips corresponded with each other in every instance, the amount of material actually loaded and delivered frequently was substantially less than that reflected on the weight slips. There was evidence that the loading device could be, and regularly was, manipulated so as to release less than a standard 4,000-pound batch. Thus, while the correct number of batches were loaded onto each truck, so that a PennDOT inspector who was merely counting the number of batches would be unaware of any wrongdoing, when the inspector's attention was diverted the loaders could cheat by manipulating the device.

The development of the Government's case against these defendants may be summarized as follows: A State Police officer (one Stetor) set up a portable scale along a level stretch of highway between the batch plant and the construction site, on October 21, 1977. Without obtaining a search warrant, he stopped and weighed five of defendants' loaded trucks, and obtained from the drivers both the white and yellow

weight slips,[1] which were immediately photocopied and returned to the drivers. He then permitted the vehicles to proceed to their destination.

At that point, the officer knew the gross weight of each loaded vehicle, and what the weight slips reflected as the weight of the cargo. But in order to determine the actual weight of the bituminous material being delivered, it was necessary to ascertain the weights of the empty trucks ("tare weights"). Accordingly, three days later, the officer visited the Clairton plant, explained to the defendant Schaefer the purpose of his investigation, and sought to obtain the tare weights of the respective vehicles which he had weighed on October 21. Schaefer expressed a willingness to cooperate, and arranged by radio to have the empty vehicles returned to the plant so that they could be weighed.

When the tare weight of each vehicle was subtracted from the previously determined loaded weight, it became apparent that each of the five trucks contained substantially less bituminous material than was reflected on the weight slips.

The State Police reported their findings to federal authorities, who then continued the investigation. On December 19, 1977, the FBI interviewed Noah Smith, a Clairton Slag employee in charge of loading asphalt into the company's trucks. Smith denied any knowledge of short-weighting. After Smith was given immunity from prosecution, however, he testified before a federal grand jury on April 4, 1978, that his immediate supervisor, plant superintendent Richard T. Perlick, had instructed him to short weight the trucks, and that he frequently did so. Between October 1978 and March 1979, the FBI interviewed other Clairton Slag employees as well as the PennDOT plant inspector. As a result of the FBI's investigation, Perlick was indicted and convicted. Thereafter, as part of an agreement with the prosecutor concerning his sentence, he agreed to cooperate with the

Government and implicated Schaefer in the short-weighting scheme. Schaefer and Clairton Slag were thereupon indicted on December 5, 1979.

The Government's evidence at trial included (1) the evidence discussed above, establishing that the five trucks weighed on October 21, 1977 all contained substantially less material than was being claimed; (2) the testimony of various employees who loaded the trucks, admitting that they shortweighted these and many other deliveries at the direction of the plant superintendent, Perlick; and (3) the testimony of Perlick to the effect that the shortweight scheme was carried out with the full knowledge and approval of the defendant Schaefer.

The defendants sought unsuccessfully to exclude the evidence obtained by Officer Stetor on October 21, 1977. When their suppression motion was denied, they, not unnaturally, chose not to argue that shortweighting had not occurred, instead limiting their argument to the contention that Schaefer was not involved in the scheme.

## II.

In originally refusing to suppress the challenged evidence, the trial judge ruled that Officer Stetor did not need a warrant to stop and weigh the trucks or to obtain the weight slips from the drivers, because of the provisions of a Pennsylvania statute for the enforcement of weight limitations of vehicles on public highways, 75 Pa.C.S.A. §§ 4901, 4981(a). In the initial appeal, this Court held that stopping and weighing the trucks, and obtaining the weight slips, constituted a search and seizure to which these defendants had standing to object, and that the cited statute did not obviate the need for a search warrant in these circumstances. The Court noted that the officer was not looking for overweight vehicles, but rather for underweight vehicles as part of an investigation totally unrelated to the regulation of motor vehicles; and that invoking

---

1. In the case of one of the vehicles, the officer did not obtain the yellow slip that day; it was, however, turned over to him by the defendant Schaefer during the follow-up visit of October 24, 1977, discussed *infra*.

the overweight-truck statute was merely a pretext. In remanding for an evidentiary hearing on the suppression motion, the court stated:

> If in such a hearing it is determined that there is some other justification for the warrantless seizure than the Pennsylvania's overweight statute, the conviction may stand. Moreover, if the Government cannot establish that the seizure satisfied the Fourth Amendment, but can establish that all the evidence used in the trial had a source independent of the October 21 seizure and its fruits, the conviction may stand. But if it is determined that the seizure cannot be justified and that evidence derived from it was used at the trial, a new trial must be granted.

As noted above, the district court has now ruled that the search and seizure in question were consented to by the defendants; that, even if the warrantless weighing of the trucks was unlawful, its taint did not extend to Perlick's testimony, which implicated Schaefer in the crime; and that, in any event, the evidence was harmless. We now address these issues.

### III.

There is no basis in the record for suggesting, and indeed no one contends, that the defendants consented to the October 21 search and seizure at the time it occurred. The district court's finding of consent is, as we understand it, based upon the following reasoning: The information obtained by Officer Stetor on October 21 was incomplete and useless until he obtained the tare weights of the vehicles involved. When he visited the Clairton establishment three days later, Schaefer was made aware of what had occurred on October 21, and of the purpose of the investigation, but nevertheless voluntarily supplied the missing ingredient, namely, the weights of the empty vehicles. Therefore, Schaefer must be deemed to have acquiesced in, and consented to, the October 21 search and seizure. We disagree.

If the October 21 seizure was unreasonable, and therefore unlawful, when it occurred—and there is nothing in the present record which impairs the holding of the earlier panel that it was—we fail to see how it could possibly be rendered reasonable and lawful by the fact that, three days later, the defendants consented to the production of *other* evidence. There may, of course, be situations in which the evidence voluntarily supplied by a defendant is largely duplicative of the evidence previously obtained unlawfully, but that is not our case; indeed, even in this hypothetical situation the correct ruling might be, not that the defendant had consented to the earlier seizure, but that his later voluntary disclosures had mooted the issue.

The Government's arguments attempt to picture this case as one in which the officer had told Schaefer, in effect, "We have obtained items A, B, and C, but we cannot prove a case against you unless you voluntarily supply us with item X," whereupon Schaefer voluntarily produced item X. Even in that situation, it would be difficult to avoid the conclusion that Schaefer's consent stemmed from, and was tainted by, the illegality of the initial seizure of A, B, and C. But we need not dwell upon that question, for the undisputed facts of this case present a quite different picture. Officer Stetor testified (App. 274) that before returning to the plant on October 24 to obtain the tare weights, he had been advised by a PennDOT official that, under the contractual arrangements between Clairton Slag and PennDOT, lists showing the tare weights of all of defendants' trucks had been prepared, and that a copy of such a list was supposed to be posted at Clairton's plant. He then stated:

> . . . and we went back to obtain it. No one could seem to locate the list of the trucks that were used on the job and their tare weights, and at this point Mr. Schaefer indicated that he would like to cooperate with us, and we asked him about the tare weights, and he said there would be no problem, he would call his trucks in and have them weighed before our eyes if we had any problems with obtaining the sheets with the tare weights on them.

Thus, rather than freely and voluntarily supplying a crucial missing element which alone rendered the previously seized evidence incriminating, the defendants merely expedited the procurement of evidence which the police would inevitably have obtained in any event.

■ Moreover, the plain implication of the district court's holding is that Schaefer, knowing that the tare weights of the trucks could provide the remaining piece of evidence necessary to prove short-weighting, should have refused to allow Stetor to weigh the trucks. But a suspect is not required to resist or impede law-enforcement efforts in order to preserve existing constitutional claims.

For the foregoing reasons, we are compelled to reject the district court's holding that the October 21 search and seizure were consented to by the defendants.[2] The remaining issues are attenuation of the taint, and harmlessness of the error.

## IV.

The evidence obtained by Officer Stetor on October 21, 1977 included: (1) the identity of each of the five vehicles which were weighed; (2) the actual gross weights of the loaded vehicles; (3) the white, PennDOT, weight slips; and (4) the yellow, Clairton Slag, weight slips. At this juncture, our concern is only with the second and fourth categories. It is reasonable to suppose that the numbers or other appropriate means of identifying the particular vehicles were not within the defendants' zone of privacy, since the vehicles were being operated on a public highway, and could presumably be adequately identified upon casual observation. The white weight slips were the property of PennDOT, only temporarily in the custody of defendants' employees. The defendants had no cognizable privacy interest in retention of those documents which could prevail against PennDOT's consent that they be made available to the police.

Thus, the issue is whether the receipt in evidence of the actual weights of the loaded vehicles, and the yellow weight slips, together with such other evidence as may have been derived therefrom, was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966).

■ It first becomes necessary to decide how much of the Government's evidence should have been excluded. Appellants argue that, since the search provided the first solid lead and triggered the entire ensuing investigation, all of the Government's evidence should be deemed "fruits" of the constitutional violation. We are not persuaded that the proper application of the exclusionary rule warrants that extreme result.

In *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court held that verbal evidence, the testimony of witnesses, can be "no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion" (at p. 485, 83 S.Ct. at p. 416), and that the question is whether "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint'." *Id.* at p. 491, 83 S.Ct. at p. 419. More recently, in *U.S. v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), the Court made clear that such attenuation, and hence admissibility of the testimony, is more readily to be found when the alleged "fruits" consist of the testimony of witnesses, as distinguished from tangible physical evidence; and that the factors to be considered include the following: whether the unlawful intrusion led directly to the testimony in question; the length of time between the unlawful intrusion and discovery of the challenged testimony; whether the witness was himself a suspect; the degree of free will exercised by the witness; and the time, place and manner of the initial questioning of the witness.

---

**2.** The Government's alternative contention that the voluntary disclosure of the tare weights on October 24 constituted "ratification" of the October 21 seizure is merely a different, and unsatisfactory, formulation of its "consent" argument.

Applying and balancing these factors in the present case leads to no other conclusion than that the testimony of the Government's witnesses should not be suppressed. In the first place, the unlawful intrusion did not lead directly to the witnesses. The officer did not learn the identity of any witness as a result of the unlawful search, and would have questioned these individuals irrespective of the search. While the evidence unlawfully obtained undoubtedly stimulated the police to continue their investigation, there is no reason whatever to suppose that, absent the October 21 seizure, the entire investigation would have been abandoned.

The most that can be said in support of excluding this testimony at the trial of these defendants is that Smith's knowledge that the FBI had the seized evidence was a substantial factor in his decision to accept a grant of immunity and to testify against Perlick; that Smith's testimony and the seized evidence led to the indictment and conviction of Perlick; and that Perlick's conviction and the imminent prospect of being sentenced induced him to agree to testify against these defendants. This recital demonstrates that the logical, "but for," test of causality is met, but under the Supreme Court's holding in *Ceccolini,* that is not enough to justify exclusion.

Under *Ceccolini,* the unlawful seizure did not "cause" Smith to testify: When first confronted with the evidence, he maintained his innocence. His later decision to testify was the result of his voluntary decision to accept the proffered grant of immunity. Similarly, Perlick's decision to testify against these defendants was not the product of the unlawful seizure, but stemmed from his voluntary decision to promote his own interests with respect to sentencing. And the rather extensive lapse of time between the unlawful intrusion and the availability of the witnesses' testimony militates strongly in favor of a finding that the taint had been attenuated.

It is important also to bear in mind that the evidence seized on October 21 would have been admissible against Smith if he had stood trial, and was admissible at the trial of Perlick, because it was not obtained in violation of their Fourth Amendment rights. Thus, Perlick's conviction must be deemed valid and unassailable (and certainly unassailable by these defendants). And we are entirely satisfied that it was that conviction, and not the evidence which may have helped to bring it about, which led to his decision to testify against these defendants.

In applying the harmless error rule, therefore, we limit ourselves to consideration of the significance of the improperly admitted evidence of the gross weights of the five trucks, together with the yellow copies of the weight slips.[3]

In order to convict on the substantive count, the Government had to prove that the weights reflected on the weight slips presented for payment under the contract were false, in excess of the actual weights (*i.e.,* the fact of misrepresentation) and that Schaefer knowingly caused or permitted the misrepresentations to occur. There can be no doubt that the unlawfully obtained evidence formed a very important part of the Government's proof at trial. The five yellow weight slips were the only documents attributable to the defendants which were directly proven to be misrepresentations. And the fact that all five vehicles were short-weighted was strong refutation of any contention of accident or inadvertent clerical error.

■ We do not mean to suggest that, without the questioned evidence, the jury would have been bound to acquit. But it is certainly true that, without the challenged evidence, the Government's proof would have been limited to the testimony of arguably disgruntled employees, testifying under a grant of immunity or pursuant to a pre-sentencing bargain with the Government, corroborated only by each other. The conclusion is simply inescapable that the improperly admitted evidence provided im-

---

**3.** We regard all five of the yellow weight slips as fruits in the unlawful seizure.

portant corroboration of the witnesses' testimony.[4]

 The Government makes much of the fact that the sole defense argument to the jury was, not that the Government had failed to prove a systematic practice of short-weighting, but that the defendant Schaefer had no knowledge that the wrongs were occurring and had not authorized or approved the practice. And the district court's conclusion that the error, if any, was harmless appears to have been based upon that premise ("The weights of the five trucks were not an issue in the trial of Schaefer. This issue was conceded. Therefore, the admission of the evidence was not crucial to the outcome of the case....") (App. 317.) But error in admitting evidence unconstitutionally obtained is not rendered harmless by the fact that the evidence is convincing or uncontroverted. When a police officer is permitted to testify to the product of an unconstitutional search and seizure, the defendant does not waive the error, or reduce it to harmlessness, by failing to attack the officer's credibility. The test under *Chapman v. California, supra,* is the importance of the evidence in the context of the trial as a whole, and is not affected by the stratagems thereafter resorted to by defense counsel in an effort to reduce the damage. On this record, the error cannot be deemed harmless.

Indeed, in remanding this case for an evidentiary hearing on the suppression motion, the earlier panel decision effectively ruled against the Government's harmless-error contention. The terms of the remand were quite precise:

4. The court's charge to the jury included the following (App. 240):

"The Government contends, as I understand it, that Perlick and Noah Smith admit that they were doing this, and their admissions were corroborated, in large part, by an inspection made by the Pennsylvania State Police on October 21, 1977, when certain of these trucks were weighed full on the highway and then weighed without a load and then, by subtractions, determining what the loads were, and it was found that, in the five trucks weighed on that day, the five trucks

But if it is determined that the seizure cannot be justified and that evidence derived from it was used at the trial, a new trial must be granted.

637 F.2d 200, 205.

V.

The judgment appealed from is reversed, and the case is remanded for a new trial.

were light with respect to their loads, in varying amounts ranging from 6,030 pounds to 7,250 pounds in one case, down to 2,236 pounds in another, and to the extent of 3,700 pounds in another case, which the Government contends corroborates the fact that the yellow slips calling for 48,000 pounds were false."

The corroborative impact of the challenged evidence was equally important to the conspiracy count, so there is no basis for differentiating between the substantive and conspiracy convictions.