**John Charles LESKO, Petitioner,**

v.

**Glen R. JEFFES, Commissioner of the Pennsylvania Department of Corrections; Charles Zimmerman, Superintendent of the State Correctional Institution at Graterford; Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview; Henry G. Barr, General Counsel of Pennsylvania; and Leroy Zimmerman, Attorney General of the Commonwealth of Pennsylvania, Respondents.**

**Civ. A. No. 86–1238.**

United States District Court,
W.D. Pennsylvania.

May 2, 1988.

Rabe F. Marsh, III, Greensburg, Pa., Professor Welsh White, University of Pittsburgh, Pittsburgh, Pa., for petitioner.

John J. Driscoll, Dist. Atty., John Peck, Asst. Dist. Atty., Greensburg, Pa., Leroy S. Zimmerman, Atty. Gen., Robert Graci, Chief Deputy Atty. Gen., Harrisburg, Pa., Roslyn Robinson, Com. of Pennsylvania, Office of Gen. Counsel, Harrisburg, Pa., Joseph P. Mazurkiewicz, Superintendent, Rockview Correctional Institution, Bellefonte, Pa., for respondents.

Stefan Presser, American Civil Liberties Union, Stewart Lev, Philadelphia, Pa., for amicus curiae ACLU.

## MEMORANDUM OPINION

BLOCH, District Judge.

Petitioner John Charles Lesko has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, setting forth numerous contentions of error arising out of his trial, conviction and sentence on charges of criminal homicide and criminal conspiracy in the Court of Common Pleas of Westmoreland County, Pennsylvania. The Court concludes that petitioner was deprived of his right to a fair trial guaranteed by the Fourteenth Amendment and, therefore, grants the writ.[1]

### I. Facts

Early in the morning of January 3, 1980, Officer Leonard Miller was killed by two bullets fired from a .38 caliber revolver. His body was discovered by fellow police officers who had heard his radio message stating that he had been shot. Testimony at trial revealed that shortly before the shooting, Miller was observed in his patrol car in the parking lot of a local convenience store. A Lancia sports car was observed repeatedly driving past the officer at a high rate of speed.

The primary Commonwealth witness at trial was Richard Rutherford, a juvenile who had been present with the petitioner and his co-defendant Michael Travaglia throughout the evening of January 2–3, 1980. Rutherford testified that upon observing Officer Miller in his patrol car at the side of the road, Travaglia, the driver of the automobile in which the three men were riding, stated that he wanted to "have some fun with this cop." He then sped past the officer's car and beeped the horn. When the officer did not pursue the car, Travaglia turned around and sped past him again, at which point Miller gave chase. After a short time, Miller forced the car to the side of the road. Travaglia rolled down the window on the driver's side of the car and, as Miller approached, fired two shots, at least one of which struck the officer.

The officer returned fire, striking the passenger window of the automobile.

The statements of Travaglia and petitioner were introduced at trial. Travaglia maintained that he shot Miller accidentally when the hammer of the gun slipped and a shot was discharged. Petitioner stated that the purpose of speeding past Miller was to draw him away from the convenience store so that they later could return and rob it.

Rutherford gave additional testimony that, later the same day, Travaglia and petitioner met one Daniel Montgomery in downtown Pittsburgh at which time Travaglia gave Montgomery a .38 caliber revolver and stated that he had "shot a cop." The revolver later was recovered from Montgomery; ballistics tests established that it was the weapon from which the shots which had killed Miller had been fired.

The Lancia automobile was recovered following the shooting and was identified as being registered in the name of William Nichols; Nichols' wallet was found in the car. The right passenger window had been shot out. Analysis of glass fragments retrieved from the area where Miller's body was found revealed the fragments were of the same type as the glass in the windows of the Lancia automobile. A lead slug removed from the vehicle was identified by the Commonwealth's ballistics expert as having been fired from Miller's .357 magnum service revolver.

### II. Procedural History

Petitioner was charged with first degree murder and criminal conspiracy to commit murder in connection with the death of Officer Miller. Following lengthy jury selection proceedings, the trial in petitioner's case commenced January 21, 1981, in the Court of Common Pleas of Westmoreland County, Pennsylvania. Defendant was tried jointly with Michael Travaglia. The evidence presented at trial documented that Travaglia was the primary actor in the

---

1. In light of this disposition of the matter, the Court finds it unnecessary to address the remaining issues raised by petitioner.

charged offense; the jury was instructed that petitioner could be found guilty of the murder of Officer Miller only as an accomplice. On January 30, 1981, a verdict of guilty of murder of the first degree and guilty of criminal conspiracy was returned against both defendants.

The sentencing phase of the trial immediately followed return of the jury's verdict; evidence was presented concerning aggravating and mitigating circumstances pursuant to 42 Pa.C.S.A. § 9711. The jury determined that a sentence of death was appropriate as to both defendants.

Post-trial motions were filed by petitioner with the Court of Common Pleas of Westmoreland County, which motions were denied by order of April 5, 1982. On April 23, 1982, the Court of Common Pleas formally imposed a sentence of death upon petitioner.

Petitioner then filed an appeal from the judgment of conviction and sentence with the Pennsylvania Supreme Court. By order dated September 29, 1983, the Court affirmed the judgment of conviction. *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983). Reargument was denied on December 14, 1983.

On February 13, 1984, petitioner filed a petition for a writ of certiorari with the United States Supreme Court. The writ was denied on June 18, 1984. *Lesko v. Commonwealth*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984).

Having completed the remedies available to him on direct appeal, petitioner then filed a petition for post-conviction relief with the Court of Common Pleas of Westmoreland County, pursuant to the Pennsylvania Post–Conviction Hearing Act, 42 Pa. C.S.A. § 9541, *et seq.* The petition was denied on June 11, 1985. On July 10, 1985, petitioner filed an appeal from the order of June 11, 1985, with the Pennsylvania Supreme Court. In an order dated November 12, 1985, the Supreme Court affirmed the trial court's denial of post-conviction relief. *Commonwealth v. Lesko*, 509 Pa. 67, 501 A.2d 200 (1985). Rehearing was denied on April 2, 1986.

On May 31, 1986, petitioner filed a second petition for a writ of certiorari with the United States Supreme Court, which was denied on February 23, 1987. *Lesko v. Commonwealth*, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987).

The instant petition was filed with this Court on June 11, 1986. The following day, this Court granted petitioner's request for a stay of execution, having found that the petition for habeas corpus presented a substantial question on the merits, i.e., whether a jury instruction during the penalty phase of a capital case directing the jury not to be swayed by sympathy for the defendant violated the defendant's rights under the Eighth Amendment to the United States Constitution.

A substantially similar issue was pending review before the United States Supreme Court in the case of *California v. Brown, cert. granted,* 476 U.S. 1157, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986). Accordingly, the parties' obligation to address the merits of the habeas corpus petition was stayed pending the Supreme Court's decision in the *Brown* case, which was rendered January 27, 1987. 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). Following the *Brown* decision, a briefing schedule was established. Briefs having been received, the case is ripe for disposition on its merits.

### III. The Issue Presented

During the guilt phase of the trial, the Commonwealth introduced evidence, over petitioner's objection, of another homicide which he and Travaglia had committed on the same evening as the Miller homicide. Petitioner contends that the admission of this evidence deprived him of his right to a fair trial, guaranteed by the Fourteenth Amendment. (Petition, pp 25–33).

The evidence in question concerned the murder of William Nichols, the owner of the Lancia sports car. The facts of the Nichols' homicide were presented to the jury through the testimony of Richard Rutherford.

Rutherford's testimony was as follows. On the evening of January 2, 1980, Travaglia abducted Nichols from the Edison Hotel

Bar in the City of Pittsburgh. In the company of petitioner and Rutherford, Travaglia forced Nichols to drive out of the City of Pittsburgh. Upon entering the car and before leaving the City, Travaglia produced a gun and shot Nichols in the arm. After traveling some distance, Nichols was handcuffed and placed in the back seat of the automobile. As the evening progressed, petitioner repeatedly punched the wounded and bound man in the face with his fists, taunting him with a knife, calling him a "queer" and asking him if he wanted to perform deviate sexual acts. Travaglia, driving the automobile, would occasionally slow down and strike the victim. Nichols repeatedly pleaded with petitioner and his co-defendant to stop and asked what they intended to do to him.

Eventually Nichols slipped into unconsciousness. His scarf was cut in half and part of it stuffed into his mouth. The remaining part was tied around his head as a gag. Travaglia then stopped the car in a wooded area by a frozen lake. Nichols was dragged from the car, still handcuffed and with his feet bound. Travaglia and petitioner then dragged Nichols across the edge of the frozen lake to a hole which they had broken in the ice. Although Rutherford testified that he did not see Nichols enter the water, he stated that, as they left the scene, Travaglia commented that Nichols came up one time, was coughing and then disappeared beneath the surface of the water.

Prior to the introduction of this evidence, petitioner's counsel moved to have the evidence excluded. Counsel argued that the evidence was irrelevant and could have no bearing upon any motive attributable to petitioner. This motion was denied. Counsel then requested that the court review the statements of Travaglia and petitioner prior to ruling on the admissibility of Rutherford's testimony, since the statements contained matters relating to motive. The court agreed to do so, and following review of the same, ruled that the evidence was relevant to the issues of motive and the defendants' state of mind in that it tended to reduce the possibility that the Miller homicide was an accident and had a bear-

ing upon the degree of homicide at issue. In addition, the trial judge ruled that the evidence of the Nichols' killing was admissible because it was an event closely related to the murder of Officer Miller, in that the two murders occurred within the space of three or four hours. Thus, the judge ruled, the two homicides could be seen as a single series of events.

Weighing the probative value of this evidence against its potential for prejudice, the trial judge determined that its tendency to counteract Travaglia's assertion that the killing of Officer Miller was a mistake outweighed whatever prejudice would be caused by its admission.

Petitioner's counsel moved that the testimony be limited to the fact that Nichols' car was stolen and that Nichols was killed, there being no need to present the lurid details of the killing to the jury. The motion was denied. Accordingly, Rutherford was permitted to testify, not simply to the fact of the Nichols' killing but also to the details surrounding Nichols' death, as set forth above.

The judge at this point in the trial did not instruct the jury regarding the limited purposes for which the evidence of the Nichols' homicide was being admitted. During his final charge, however, he did explain that the jury was not to consider this evidence for purposes other than establishing motive or rebutting the claim that the shooting of Officer Miller was accidental.

## IV. Exhaustion

■ A habeas corpus petitioner must exhaust available state remedies before the federal court may entertain his petition for habeas corpus relief. *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b) and (c). Principles of comity and deference underlie the exhaustion requirement, which assures that the state courts will have the first opportunity to address the habeas petitioner's claims, without interference from the federal judiciary. *Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct.

407, 30 L.Ed.2d 418 (1971); *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). In addition, there are practical reasons for requiring that federal issues first be presented to the state courts. The requirement "affords the parties the opportunity to develop the record necessary for adjudicating the issue [and] insures that if there are independent and adequate state grounds that would permit the federal issue they will be identified and acted upon in an authoritative manner." *Webb v. Webb,* 451 U.S. 493, 500, 101 S.Ct. 1889, 1894, 68 L.Ed.2d 392 (1981).

■ The Commonwealth states that the petitioner has satisfied the exhaustion requirement by presenting to the state courts the numerous claims contained in his petition at one point or another in the post-trial and appellate process. A concession by the state's counsel, however, is insufficient in itself to dispose of the exhaustion issue; rather, an "independent judicial inquiry" is required. *Zicarelli v. Gray,* 543 F.2d 466, 471 (3d Cir.1976); *see also Brown v. Fauver,* 819 F.2d 395 (3d Cir.1987).

■ The exhaustion requirement is satisfied once the federal claim has been "fairly presented" to the state courts. *Picard v. Connor,* 404 U.S. at 275, 92 S.Ct. at 512. In order to be fairly presented, the claim raised in the habeas proceeding must have rested upon the same legal and factual bases in the state court, *Hill v. Zimmerman,* 709 F.2d 232 (3d Cir.), *cert. denied,* 464 U.S. 940, 104 S.Ct. 354, 78 L.Ed.2d 318 (1983); that is, the same method of analysis must have been presented to the state and federal courts. *Chaussard v. Fulcomer,* 816 F.2d 925 (3d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 139, 98 L.Ed.2d 96 (1987); *Zicarelli v. Gray,* 543 F.2d 466 (3d Cir.1976).

■ On direct appeal from the judgment of conviction, the petitioner argued that the introduction of evidence of the Nichols' homicide was error justifying the grant of a new trial. The legal basis of this argument was not the Fourteenth Amendment's due process clause, however; the argument presented to the Pennsylvania courts rested upon principles of state evidentiary law.

The briefs presented to the state courts in post-conviction proceedings addressed the evidence of the Nichols' killing, but only in the context of an argument concerning the claimed failure of the Pennsylvania Supreme Court, on direct appeal, to give petitioner the proportionality review required by the Pennsylvania death penalty statute, 42 Pa.C.S.A. § 9711(h)(3)(iii). Due process issues were not raised. In short, while the state courts have been presented with an opportunity to address the prejudicial effect of the admission of the evidence, the issue has not been phrased in terms of due process concerns prior to the filing of the instant habeas petition.

■ Despite this fact, the requirements of exhaustion doctrine have been satisfied. Inasmuch as the legal standards employed to evaluate a due process claim arising out of the admission of prior crimes evidence are essentially identical to those applied by the Pennsylvania Supreme Court in its evaluation of petitioner's claim on direct appeal, the purposes which exhaustion is designed to serve have been met. Due process analysis, when applied in the context of claimed error arising from evidentiary rulings, requires an assessment of the prejudicial effect of the evidence in the context of its probative value. *See, e.g., Osborne v. Wainwright,* 720 F.2d 1237 (11th Cir.1983); *Panzavecchia v. Wainwright,* 658 F.2d 337 (5th Cir.1981); *United States ex rel Lowry v. Myers,* 364 F.2d 297 (3d Cir.1966). This process parallels the analysis employed by the Pennsylvania Supreme Court, in its evaluation of the evidentiary question at hand. *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 296–98 (1983). Moreover, an argument that highly prejudicial evidence was erroneously admitted in effect subsumes the claim that a fair trial has been denied. It is unrealistic to assume that, had the issue been framed in terms of the process due a defendant under the Fourteenth Amendment rather than under state evidentiary law, the outcome of the Pennsylvania courts' analysis would have been different.

In addition, there are no "unresolved questions of fact or of state law" which would bear upon the issue presented.[2] *Granberry v. Greer,* 481 U.S. 129, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987); *Reynolds v. Ellingsworth,* 843 F.2d 712, 725 n. 23 (3d Cir.1988). No independent and adequate state grounds are presented which would eliminate the need to address petitioner's due process claim. *Webb v. Webb, supra.* Given the fact that this is a capital case and, therefore, a greater degree of scrutiny is appropriate, *United States ex rel Scoleri v. Banmiller,* 310 F.2d 720 (3d Cir.1962), *cert. denied,* 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963), the merits of petitioner's argument will be addressed.

## V. Due Process

 The aim of the requirement of due process is to prevent fundamental unfairness in the use of evidence, whether true or false. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). The function of a district court on habeas review, however, is not to determine whether evidence has been admitted in violation of applicable state rules. *United States ex rel Mertz v. New Jersey,* 423 F.2d 537 (3d Cir.1970). Evidentiary errors during a state criminal trial are not subject to review in a habeas corpus proceeding unless it is shown that the error was so "conspicuously prejudicial" as to deprive the petitioner of a fair trial. *United States ex rel Abdus–Sabur v. Cuyler,* 653 F.2d 828, 833 (3d Cir.), *cert. denied,* 454 U.S. 1088, 102 S.Ct. 650, 70 L.Ed.2d 625 (1981); *United States ex rel Cannon v. Maroney,* 373 F.2d 908 (3d Cir.1967).

As a general rule, evidence of prior criminal conduct is inadmissible in a criminal case, since it creates a great degree of risk that the factfinder will take it as demonstrating a defendant's propensity to commit unlawful acts, thus increasing the like-

lihood that he is guilty of the offense with which he is charged in the pending prosecution. *United States ex rel Choice v. Brierley,* 460 F.2d 68 (3d Cir.1972). The rule, however, is subject to exception; evidence of prior criminal activity may be admissible if probative of the issues of motive, identity, or a system or plan of criminal activity. *Spencer v. Texas,* 385 U.S. 554, 560, 87 S.Ct. 648, 651, 17 L.Ed.2d 606 (1976).

Difficulty inevitably arises in the application of the rule. "What may not be admissible in one situation may well be admissible in another." *Brierley, supra,* at 71. "The wiser opinions ... recognize that the problem is ... one of balancing, on the one side, the actual need for the other-crimes evidence ... and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility [toward the defendant]." McCormick, *The Law of Evidence* (2d ed.) § 190.

Where the evidence presented is purely documentary, such as where the jury is simply informed of the fact of the defendant's previous convictions, the potential for prejudice is relatively slight; the jury is not presented with detailed information concerning the nature of the previous crimes and, therefore, whatever prejudice is engendered may be sufficiently counter-balanced by limiting instructions provided by the court. Under such circumstances, due process is not likely to be violated. *See, e.g., Spencer v. Texas, supra* (holding that admission of the defendant's criminal history under a state recidivist statute does not run afoul of the Fourteenth Amendment because "the evidence is ... almost always of a purely documentary kind, and in [the case at hand] there is no claim that its presentation was in any way inflammatory." 385 U.S. at 562, 87 S.Ct. at 652). *Cf. United States ex rel Lowry v. Myers,* 364 F.2d 297 (3d Cir.1966); *United States ex rel Scoleri v. Banmiller,* 310 F.2d 720 (3d Cir.1962), *cert. denied,* 374 U.S. 828, 83

---

**2.** The question of prejudice under the Fourteenth Amendment is one of law and not of fact; therefore, the state courts' findings on this issue are not binding on this Court. *Brewer v.*

*Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Panzavecchia v. Wainwright,* 658 F.2d 337, 339 (5th Cir.1981).

S.Ct. 1866, 10 L.Ed.2d 1051 (1963).[3]

A review of the factual circumstances of other cases holding the admission of other-crimes evidence unconstitutional would serve little purpose. Questions of prejudice and fairness necessarily turn upon the circumstances of the particular case; reasonable minds may differ over the degree of prejudice generated. The Court is aware that state court determinations concerning admissibility of such evidence should be rejected "only in the clearest of cases of gross and easily avoided prejudice." *United States ex rel Rucker v. Myers*, 311 F.2d 311, 315 (3d Cir.1962), *cert. denied*, 374 U.S. 844, 83 S.Ct. 1901, 10 L.Ed.2d 1064 (1963). Unfortunately, we are convinced that this is such a case.

The trial judge, in evaluating the probative value of Ricky Rutherford's testimony concerning Nichols' death, determined that it was relevant to the issues of motive, presumably for the reason that at the time the defendants were stopped by Officer Miller, they were traveling in Nichols' car, which contained his personal identification. The killing of Officer Miller thus could be seen to be consistent with an attempt to avoid apprehension for the prior crime. The trial judge also ruled that the evidence of Nichols' death was relevant to the degree of murder in the Miller prosecution.

Had the trial court limited the testimony of Rutherford, as requested by petitioner's counsel, excluding the details of the torture-murder of Nichols, this Court would be unwilling to conclude that a fair trial had been denied. The purposes for which the trial judge ruled the evidence admissible would have been fully served had the jury simply been presented with the fact that another murder had been committed earlier in the morning of January 3, 1980, and that the car in which the defendants were traveling at the time of the Miller homicide belonged to that murder victim.

The jury, of course, heard the testimony concerning Officer Miller's death, which testimony could not have failed to have an emotional impact. The circumstances of his death, however, were obviously relevant and, while certainly tragic, by no means were as likely to inflame the jury as the detailed recitation of the torture, intimidation and humiliation which petitioner and his co-defendant forced Nichols to endure.

The trial judge gave a limiting instruction concerning the evidence of Nichols' murder at the close of the case, more than a week following Rutherford's testimony. The jury was instructed that they were not to consider the testimony for any purposes other than motive or to rebut Travaglia's claim that the shooting of Miller was accidental. For a jury to so limit their consideration, however, would require "a feat of psychological wizardry verg[ing] on the impossible even for berobed judges." *United States ex rel Scoleri v. Banmiller*, 310 F.2d 720, 725 (3d Cir.1962). *See also United States ex rel Rucker v. Myers, supra*, at 315. The judge's instruction could not have remedied the prejudice created by the admission of this evidence.

In summary, the prejudicial effect of the detailed testimony concerning Nichols' death was enormous and easily could have been avoided. Its probative value was non-existent. The jury's deliberations concerning guilt and later, punishment, could not have failed to be affected in some significant measure by Rutherford's testimony regarding the earlier murder. The Court has no hesitation concluding that petitioner was deprived of his constitutionally guaranteed right to a fair trial.

This conclusion does not end the Court's inquiry, however. Not every constitutional violation necessarily results in the grant of a writ of habeas corpus. *Bisaccia v. Attorney General of the State of New Jersey*, 623 F.2d 307 (3d Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504

---

**3.** At least one circuit has determined that the admission of purely documentary evidence on occasion may rise to the level of a due process violation. In *Panzavecchia v. Wainwright*, 658 F.2d 337 (5th Cir.1981), the Court held that the admission of defendant's conviction for counterfeiting, during a murder prosecution, deprived him of the "fundamental fairness" guaranteed by the Fourteenth Amendment.

(1980). Due process violations are subject to a harmless error analysis; the Court must determine whether there is a "reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

■ Application of the harmless error doctrine requires the district court to be able to declare a belief that the constitutional error was harmless beyond a reasonable doubt. *Chapman, supra; United States v. Scarfo,* 685 F.2d 842 (3d Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). This inquiry compels an examination of the importance of the erroneously admitted evidence in the context of the trial as a whole. *United States v. Schaefer,* 691 F.2d 639, 646 (3d Cir.1982).

■ Applying these principles to the instant case, the Court concludes that the evidence of petitioner's guilt was so overwhelming that, even given the highly inflammatory nature of the testimony concerning Nichols' death, the jury could not have failed to return a verdict of guilt. In addition to testimony tying petitioner to the Nichols' vehicle, and tying the Nichols' vehicle to the scene of the Miller homicide, petitioner's statement was admitted into evidence. The statement contained the admission that petitioner was present in the vehicle at the time Travaglia fired on the police officer. In addition, Travaglia's inculpatory statement was admitted. Finally, the statements of the petitioner and Travaglia are consistent with the testimony of Rutherford, who was an eyewitness to Officer Miller's death.

Despite the foregoing, however, the Court is unable to conclude beyond a reasonable doubt that the admission of the evidence of Nichols' death played no role in the jury's determinations, specifically those concerning the degree of homicide for which petitioner was to be found guilty. The jury was instructed on first, second and third degree murder, as well as manslaughter. Particularly given the fact that petitioner was charged only as an accomplice, and clearly was not the principal actor in the crime, it cannot be said with certainty that the jury only could have returned the verdict of first degree murder which it did. Only a verdict of first degree murder carries with it the possible penalty of death. 42 Pa.C.S.A. § 9711.

Moreover, even assuming *arguendo* that the first degree murder conviction was inevitable, this Court cannot conclude beyond a reasonable doubt that the testimony concerning Nichols' death did not sway the jury, during the penalty phase, to return a sentence of death rather than one of life imprisonment.

■ The Fourteenth Amendment guarantees the right of a fundamentally fair trial to the guilty and the innocent alike. Where a sentence of death has been imposed and it cannot be said beyond a reasonable doubt that erroneously admitted, highly prejudicial testimony played no role in the decision to impose such a grave penalty, the Constitution requires that petitioner be granted the requested relief.[4]

An appropriate Order will be issued.

## ORDER

AND NOW, this 2nd day of May, 1988, having found that the Commonwealth of Pennsylvania holds John Charles Lesko in custody in violation of the Constitution of the United States,

IT IS HEREBY ORDERED that a writ of habeas corpus shall issue discharging the petitioner from custody imposed pursuant to his conviction and sentence in the Court of Common Pleas of Westmoreland County, Pennsylvania, at No. 681 C of

---

**4.** The grant of the writ of habeas corpus does not give rise to double jeopardy concerns. Reversal of a conviction for trial error does not bar retrial under the Fifth Amendment, since it implies nothing with respect to the guilt or innocence of the defendant or the strength of the government's case. *Burks v. United States,* 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *Vogel v. Pennsylvania,* 790 F.2d 368, 370 (3d Cir.1986); *Commonwealth v. Vogel,* 501 Pa. 314, 461 A.2d 604 (1983), *cert. denied,* 465 U.S. 1104, 104 S.Ct. 1603, 80 L.Ed.2d 133 (1984).

1980, unless the Commonwealth retries the petitioner within 180 days of this date.